We'll move on to our third argument set for today, which is Waller versus City of Nogales, case number 24-1864. Good morning, Your Honors. May it please the Court. At the heart of this case is – now, there are three Graham v. Conner factors. At the heart of this case is the third and what the Ninth Circuit has repeatedly referred to as the most important of the Graham factors, the degree of immediate threat that a suspect poses in the moment that officers choose to use deadly force under the Fourth Amendment analysis. And all indicators suggest that that most important factor in this case was not present. Well, can I ask about that because this is a – it's an interesting case. What do we – don't we have to look at the totality of the circumstances? And the reason I ask that is because I think the analysis is different from what point in time you actually consider this. I mean, if you consider everything that they went on a chase, he brandishes the knife, he threatens to cut their throat. If you consider all of that, it's a very different question about the risk of analysis from, hey, we just come upon a semi that stopped and then starts moving forward gently. So, I mean, are you arguing we should separate that first part out or you think, no, we have to consider that? But even when you consider that, the risk is not that high. This court absolutely must consider the totality of the factors. Your Honor is absolutely correct. But what you just said, the last thing you said is also correct, that the most important consideration for this third Graham factor is what happened immediately in the moment. Appellant has cited cases defining what immediacy means in this particular context. One case we cite uses the term right here, right now, not what occurred 67 minutes prior, which is the rough timeline of when this whole ordeal began from back working backwards from the shooting, but also even 60 seconds before, even 30 seconds before. In some cases, we cite numerous Ninth Circuit cases and a handful of out-of-circuit cases for this proposition. Going back to the mid-1990s in the Ninth Circuit, including, for example, Robinson v. Solano, where a gentleman was wielding a gun in a potentially threatening manner at the time that 911 was called. But by the time officers arrived, the situation had changed. Harris v. Roderick. The problem that I have with this case is we don't know what the situation had changed. There you could see what was actually going on. Here he stops. As I understand it, correct me if I have the facts wrong. He stops the semi-truck, pulls. They know he's armed and dangerous. They've said that. They've seen the weapon. He pulls the shades, and he's in there. They don't know what's happening. They've called for him to come out. What is the inference to say, oh, well, there's no more harm now? It's a fair question. I do want to correct one matter in the record, which is a smattering of officers were subjectively aware that he may possess a knife. But aside from the vehicle itself, a knife was the only potential weapon in the record. But they read out. I thought the APB went out and said he's armed and dangerous. And armed was referring to the possibility that he possessed a knife. I understand that. But, I mean, a knife will – I mean, he threatened to kill somebody with a knife. I don't understand why that's any less – I mean, maybe his ability, a gun obviously would be worse because he could shoot without getting out of the car or out of the semi. I don't mean to undermine that fact. It does exist. It is in the record. Number one, it's not clear whether he threatened to kill somebody with a knife. He did brandish it in a somewhat ambiguous manner in which he – Didn't he use the – Correct. I'm not sure what you gather from that. I think it's reasonable to assume that that was threatened to kill somebody. I would argue that at this posture in the case, the facts need to be construed in the light most favorable to the nonmoving party. What's the light most favorable to him when he pulls out a knife and does that? That it's intending suicidal intentions. Suicidal, okay. But more importantly than what he meant or did not mean by that gesture 67 minutes earlier is the fact that it occurred 67 minutes earlier. And number two, most important, is that not all the officers possessed that piece of knowledge. Most importantly, Apelli Bermudez, one of the shooting officers in the final shooting scene, was – the record indicates he did not subjectively know that fact in the moment. And likely, Officer Pimienta, another Apelli, did not know that fact either. They did know other facts which were mitigating to our client. For example, several of the officers knew that he had intentionally avoided collision with vehicles in the minutes leading up to the fatal shooting. There was an incident pointed out by Apelli's answering brief where he was entering the Walmart parking lot, for example, and he slammed on his brakes when he realized there was a civilian vehicle coming head-to-head with him at the entryway to the parking lot. So forcefully that one officer described smoke coming off the tires that he slammed on his brakes so heavily. In another instance, he weaved around two blockading parked police vehicles intentionally to avoid them, avoid collision. So officers did possess subjectively, including Officer Bermudez, possessed subjective knowledge going the other direction as well. But most importantly, what matters for the third prong of Graham, this prong we're focusing on, is the immediate – Can I just ask, before we move on to that, this is an objective test though, right? We don't look at it in a subjective analysis. We say what would an objective – I guess it's confusing because you say what would an objective officer think knowing what information was out there. So I guess that's your point. You're not saying subjectively look at these individual officers, but you're saying objectively based on that information. Correct. How would you – how do you define the right? I'm sorry? We have the two-step analysis on qualified immunity. There's got to be a violation of a constitutional right. How do you define the right? I believe I proffered in our opening brief a definition that we presented to the district court. But roughly speaking, it is whether the use of deadly force was justified in this particular instance, broad daylight, in an urban setting, but an urban setting where there are no civilian vehicles or civilian pedestrians in the path of the moving vehicle and the moving vehicle is moving at a relatively slow pace. I recognize the record does not clearly indicate speed, but I believe we can all agree it was a relatively slow speed along Grand Avenue, the final resting place. That's how I would define the right. But the interesting thing about that is in defining the right, you're sort of going against what you said earlier, which is we have to take the totality of the circumstances into effect. And what I heard doesn't take into account some of the other factors that I think are relevant to this inquiry. You've got to admit it's just different if you're chasing a guy for 60 minutes. Is that right? Was it 60 minutes, the chase? We argue 67, correct. Approximately 67. And in a big tractor trailer. Yes. This is no motorcycle. Correct. But let me let me address the and I've briefed this heavily as you as your honors saw the size of the vehicle. We cannot ignore and we do not ignore that this vehicle is larger than most police shooting vehicle chase cases. We recognize that. But the size of the vehicle is is analogous to the type of weapon, maybe in a different type of Section 1983 excessive force case. Let's take an example where a suspect wields a shotgun and a suspect wields a knife. Arguably, the shotgun has more lethality in the sense that you can strike someone at longer distances more quickly, more unexpectedly. But the Ninth Circuit and other circuits have routinely gone both ways. There are cases in the Ninth Circuit where, for example, we cite and in both of our briefs, a current RV Ridgecrest police, for example, where there's a rifle being wielded. George B. Morris, also a rifle being wielded. Glenn v. Washington County, also a rifle being wielded. Lopez v. Gilhas, also a rifle being wielded. All cases where where qualified immunity was denied to the officers when they subsequently shot the suspect holding that knife. So I would reason that the type of vehicle that the large, potentially heavy truck is tantamount to the type of weapon. Again, it's not about the type of weapon. It's about how that weapon is being wielded in the moment. And yes, true. Correct. To your honor's point. Also, during the minutes leading up to it, we're not ignoring that. To answer your earlier question about objective reasonableness, I also struggled with that as we were preparing the briefs, because you are absolutely correct that the Fourth Amendment excessive force analysis is unequivocal. It is objective reasonableness. However, it's objective reasonableness with an asterisk. And that asterisk is the court must also it's objective reasonableness for an officer standing in that position, possessing that knowledge that they possess. And not all the officers possess the same knowledge in this case along Grand Avenue. Some of them, at least one of them, I believe, knew about the knife incident. So which way does that cut, though? Because if some did possess it, I mean, it is how many shots were fired? It was it was a lot. In total, it was over 100. But in the relevant location that we're discussing, it was approximately 80 shots. Oh, OK. But still, 80 shots is a lot. Now, wouldn't you still have it? And maybe this just goes to the factual issues. But you would still have to show that those officers who didn't have if there were some officers who had that knowledge and it was reasonable, objectively reasonable for them to assume that this was dangerous, then they would have been justified in shooting. And wouldn't you say that? I mean, I've never seen a case where some officers are objectively reasonable in shooting and others are not. Well, we argue that all four appellees were objectively unreasonable, but we also argue. But they had some had knowledge of the of the of the threat. I believe I don't have it in front of me, but I believe one did. I know that Officer Pimenta and Officer Bermudez, two of the appellees, did not. Certainly did not in the record. In fact, Officer Bermudez, in his post incident interview with investigators, said, quote, unquote, I had no clue why my colleagues had initiated the initial chase 67 minutes earlier. All right. And let me ask you this. The officers in their brief, they assert that the U.S. Supreme Court has never found the use of deadly force in connection with the dangerous car chase to violate the Fourth Amendment, let alone be a basis for denying qualified immunity. So why should we hear? Well, the opposing counsel is absolutely correct. There are, to my account, four U.S. Supreme Court cases and addressing 1983 cases using lethal force against a fleeing vehicle. None of them involves the fact anything close to the facts of this case. And more importantly, one that features prominently, for example, Plumhoff v. Rickard, which opposing counsel cites voluminously, never reached the question of the constitution, the underlying constitutional violation. The Supreme Court merely ruled that it had that whatever the right may have been had not been clearly established at the time. Scott v. Harris, the other case that features prominently. This is the case that you may remember featured one of the first Supreme Court cases featuring a dash cam footage. And the Supreme Court had to grapple with that detail. I'm just going to quote from Scott v. Harris. The facts were the fleeing vehicle was racing down narrow two lane roads in dead of night at shockingly fast speeds, swerving around more than a dozen cars crossing the center line in what the Supreme Court described as a Hollywood style car chase. That is not the case in this instance. There is no indication, for example, that Mr. Cochran was swerving in and out of civilian traffic during the 67 minutes he was driving, driving through the Wal-Mart parking lot at a slow, at a slow speed at a at an ordinary speed one would expect while he by the way, he was under fire from during the first round of gunshots. Even if you're correct in trying to distinguish what happened here from the other cases, where is the case that shows that the right that you articulated is clearly established? We've cited numerous Ninth Circuit cases. Most prior to the incident here, we contend that Orne v. City of Tacoma is very analogous. The district court disagreed with us, but we contend that it also involved officers who were in close quarters. There was running red lights. There was modest speeding, I think, at certain points of that interaction. But ultimately, I thought I thought Orne, it was really driving without headlights. That seems like a far different underlying crime than what was going on here. I believe if the again, the focus on what may have occurred 67 minutes is not the constitutional standard. Yes, it is part of the totality. But what was occurring in the moment is very similar to what was occurring in Orne. It's very similar to I'll give you another one, which I don't believe was cited directly, but A.D. versus California Highway Patrol, also a Ninth Circuit case presenting similar situations. There are cases in the Ninth Circuit going back to the 90s on this issue, which we've which we've cited in our briefs. And also the consensus of persuasive authority in the other circuits. You likely saw my quite voluminous chart, including cases, Your Honor, from the Third Circuit, two cases from the Third Circuit, two cases from each of six other circuits outside of the ninth, all predating the incident. No officers in the gallows. Arizona is supposed to be familiar with third circuit cases and cases from other circuits. The U.S. Supreme Court suggests that a consensus of consensus of persuasive authority from other circuits does create clearly established law. That's the holding of Wilson v. Lane going back to the late 1990s of the U.S. Supreme Court. But that's an alternative basis for finding clearly established law. Thank you. Thank you, counsel. Go ahead, Mr. Peterson. Good morning. I'm Andrew Peterson. I represent the defendants. May it please the court. I know Judge Hawkins knows a little bit about Arizona, but I brought a map with with me that's part of the record. Because I think, Judge Nelson, you're correct that you have to look at the totally totality of the circumstances. You have to look at from the time this first started at the produce warehouse where the knife is brandished. Where the Santa Cruz County defendants, who are no longer defendants in the case, when the Santa Cruz County deputies first encountered Mr. Conkrum. When he left the Molina produce, that's after he'd been at H&M where they'd gotten the initial call, goes over to Molina, has a confrontation with the deputies. He heads south on the frontage road to get back onto the freeway to I-19. You have to get off. You have to get off the frontage road. And he ran the red light south on the south frontage road to get back on the interstate. And then he heads north. And this goes on for miles until he starts approaching the Border Patrol checkpoint. And all of this time he's being pursued with lights and sirens. This was a significant incident. He was a clear and present danger in that truckery, that 20-ton truckery. And as he approaches the Border Patrol, what does he do? He cuts through the median on the interstate to avoid it and does a U-turn. There are two people there that he almost hit, a Border Patrol who had thrown out some stop spikes. And in fact, she threw them out. He looked like he was now swerving or trying to swerve around them and towards her. And so she runs out towards where she had thrown the stop sticks. That's the Border Patrol Agent Holscomb. Then he's making his turn and there's a Santa Cruz deputy there, Deputy Anza, and he almost hits him. Then he heads back down to Nogales. Yeah. Council, we're aware of the facts here and several of them are helpful to you. At the end of the day, we always get these cases. And at the end of the day, whatever happened is still tragic. And you're left there thinking, okay, why did it have to happen this way? And I'm trying to understand because I thought there was actually a discussion of using nonlethal force, breaking a window. What ended up happening there? Why wasn't or was it used and it just wasn't effective? Right. And that brings up my map a little bit. I hauled this all the way up from Tucson, so I thought I better – I don't know if you can see it or not. So here, this is Mariposa. Before you start pointing, Council. Yes. Did you ask permission to use this? I informed your court clerk that I had an exhibit, a map. And that's part of the record. It was in Council? That's part of the record. I didn't ask him about showing this part of the record exhibit. Where is that in the record? This is in two places. It's – I think in the initial motion that they filed, plaintiffs filed, they referred to it as a Google map. We then attached that in our response to their motion. This photograph is in the record? It is. Where? That's – This is going to distract from my argument here to give you the citation, but I'll give it to you. If you look at, for instance, ER-164 to ER-164, and it's the same map that's attached to our reply, which they referenced in their – But your representation is, if we look at ER-164 and that map, these are – this is just a Google – This is just a broader Google map, the one that they referred to in the record. Okay. ER-164 is actually showing the Walmart, and I think it's important because Joanna just asked, well, weren't they trying to use less than lethal? Initially, they were trying to stop him. Well, but they were also using lethal force to stop – or I don't know if you counted. They were shooting at the wheels, as I understand. Well, that came only after he comes off, and that's why I wanted to show you the map. He's coming down Grand Avenue. Yeah, but my point is once he was stopped there, they had a discussion of what to do. He draws the shades. I thought they had a discussion of, hey, let's break the window and use nonlethal force. They did, and they tried to. And what prevented that? Well, breaking the window, they were able to break the one window. The flashbang grenade that they were trying to throw in didn't function correctly. It didn't go off. But in the meantime, one of the deputies, one of the officers had cut the brake lines. So now when he takes off from the parking lot, you've got to remember he's pulled up on the west entrance of the Walmart. Where all these pedestrians – look at Chief Bermuda's affidavit. Where he's out there, he's there. I think Judge Nelson's question, at least as I understood it, focused on the moment that the fatal shots were fired. All right. Was the – can I finish? Sure. Was the vehicle at rest? No. It was still moving? It was still moving. It was not until they had – And that's what prompted it apparently. So when it was at rest, they were doing all these things. They cut the brakes. They broke the window. And then he started moving, and that's what prompted the shots? It did. And that's in the Walmart parking lot. We're not even back on Grand yet. Now he's dragging the trailer. Remember, when he pulls into the Walmart, he hits the curb and blows out one of his tires on his trailer. So he's already somewhat disabled. He's there in the parking lot. He's not responding to them. They're trying various things, including cutting his brakes. Then he leaves, and he's dragging this trailer. This 20-ton truck is dragging this trailer as he's leaving. And what does he do when he leaves? There were two patrol cars up on the west end of the Walmart before White Drive. And before then, he goes through those vehicles. He crashes through those vehicles, the police vehicles. And he doesn't stop. He doesn't slow down. They're shooting at him to get him to try to get him to stop. Wasn't there something in the record that the officers who may have fired the fatal shot weren't sure where some of the other shots were coming from and may have been coming from the truck? No, it wasn't. Chief Bermuda's shot is the one that was a fatal shot. When you're referring to other officers didn't know where the shots were coming from, that's before he leaves the Walmart parking lot. Okay, that's before that. Yeah. All right. Does that make a difference? No, honestly, no. They knew he was a threat. He wasn't stopping. He was still moving. They tried every way to try to stop him. How do you stop a 20-ton wreck? Do exactly what these officers tried to do. In fact, endangering themselves. Can you imagine jumping up on the back of that thing and cutting the break lines trying to stop this? Wasn't the trailer pretty much disabled at that point coming out of the Walmart parking lot? Absolutely, but he was dragging it, according to one of the witnesses, like it was a wagon behind a car. Didn't slow him down. When he comes out, he almost hits another civilian. They talk about in their brief that there were no pedestrians or civilians around. The one video, the video was taken by a civilian. It looks like it's being videoed outside of a bus on Grand Avenue. And let's talk about the record. The record is they didn't take a single deposition in this case. They didn't hire an expert to review this case. The record is our affidavits detailing what occurred. How do you define the constitutional right? I don't have to. The Tennessee v. Garner tells us what it is. Tennessee v. Garner tells us what the right is. You cannot use deadly force unless there's an imminent or immediate threat of significant harm. We've had that Garner since 1985. Do you think the district court properly defined the right? It did. It did. And Ranner Collins has been doing this a long time. He looked at this. He considered it carefully. He defined the right correctly. You can't. I mean, they're trying to make this right. Take out everything that happened up until the last few seconds. But did the district court define the right at all? I don't know what the right is under their argument. I mean, doesn't the district court have to – didn't the district court have to define the right before it makes the determination that there was no violation of that right? No, we don't. I think we can go to the second prong unclearly as to whether there was or was not. Well, how can you go to the second prong if you don't know what the right was? I'm sorry? How can you jump to the second prong if you don't know what the right was? Well, it's a Fourth Amendment right, but that's exactly the same thing the Supreme Court did in Kissela, the shooting from Tucson at the University of Arizona. The court did not go through and decide. In fact, it said, you know, we don't have to go there. We don't know. It's far from unclear whether this right was – whether there's a Fourth Amendment violation and then went to the clearly established prong. And so why don't you tell us a little bit about some of these cases? Describe the Ornn case because opposing counsel brought up the Ornn case and said that that clearly establishes that what the officers did here was wrong. I don't read Ornn that way. We went through each of their cases as did the district judge trying to, you know, look at those cases and see whether they're factually similar. I don't – off the top of my head, I read so many of these yesterday. I don't remember the specifics of Ornn. But it was not – Ornn does not tell us that under these circumstances you cannot use deadly force. If I remember correctly, Ornn, there was a question about whether he was armed. I think more analogous cases may be the Washington case, the Sparks case, City of Sparks case just from last year. I think that's a little bit more analogous. The Sparks case that was Ninth Circuit? Yes. And tell me about that case. That case, I think it's called Washington v. Sparks. It's the City of Sparks. That case allowed the use of deadly force. You have a situation, going back and looking at Plum Hawk, situation where there is a high-speed chase that goes on for a long time. They think they got him cornered and he tries to escape, and they use deadly force. That's a little bit more analogous. And to be fair to the officers involved in this, here we have – you've got to remember, on this day, of all things, the reason why Officer Pimenty and Patrice got involved, because they were headed to Tucson to be part of the procession on bringing back the body of a Nogales police officer who was killed while he was directing traffic. That's how they got involved. That's why all these other officers were fairly close, including the chief himself. And you probably had nearly all of the department responding to this threat to try to stop it, risking their own lives in trying to stop this, including Chief Bermudez, who was at Mariposa Way trying to stop traffic as this truck comes through and runs the red light. Appellant counsel says that some of the officers didn't know exactly all of the circumstances. Pimiente knew because he was there all along. He was the one who saw – initially saw the truck headed up towards the Border Patrol, saw the turnaround, making the U-turn across the median. Bermudez had heard all of this on the radio, what was going on. Bermudez was standing in the intersection as the truck blows by and the driver flips him off. Just a total disregard for human life. That's what they were facing. And it was reasonable to use deadly force to stop this threat. Any other questions from the court? I appreciate your time. We ask that you affirm Judge Collins' decision. Thank you. Thank you, counsel. We'll give a minute for rebuttal. Is that right? Yeah, you have a minute because I think you'd used it up. Thank you. I appreciate that courtesy, Your Honor. Just a quick point on counsel's Ninth Circuit cases. He did mention the Sparks case. For the record, that is Williams v. City of Sparks. That case was issued in 2014, three years after the incident in this case. Opposing counsel also cited in his answering brief, Sabi, I don't know the pronunciation, S-A-B-B-E. The problem for you is you need to have a case that shows that it was clearly established that this was wrong. Even if you're right about all that, they don't have the burden. Again, Oren v. City of Tacoma. There's a case called Villanueva, which we brief extensively in our briefs. AB v. California Highway Patrol. And there's a, I'm sorry, Adams v. Spears, an older Ninth Circuit case. There's four Ninth Circuit cases we brief extensively, and Oren in particular we believe is on point. In addition to that, I will reiterate the consensus of persuasive authority from other circuits, from, I believe, six other circuits. It's not insignificant. Thank you. Okay, thank you. Thank you to both counsel for your arguments in the case. The case is now submitted.
judges: HAWKINS, Fisher, NELSON